IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GUADALUPE PLACENCIA, as Personal Representative
to the Estate of ADRIAN PLACENCIA

    Plaintiff,

v.        No.

HIDALGO COUNTY BOARD OF COMMISIONERS, DOLLY
WARD, CHRISTINA TALAVERA, TY HENDRIX, FELIX
JIMENEZ, VITAL CORE HEALTH STRATEGIES, LLC,
GLENDA MCKENNA, and CHRISTY LEWIS

    Defendants.

**COMPLAINT FOR THE RECOVERY OF DAMAGES**
**CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS**

Plaintiff brings this complaint for damages caused by the violation of his civil and constitutional rights. Plaintiff files this complaint under the federal Civil Rights Act, and the Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims Act and Wrongful Death Act. In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. Venue is proper as the acts complained of occurred exclusively within Hidalgo County, New Mexico.

**PARTIES**

2. Plaintiff Guadalupe Placencia, as Personal Representative to the Estate of Adrian Placencia is an individual and resident of Hidalgo County, New Mexico.

3. Guadalupe Placencia was appointed Personal Representative pursuant to the New Mexico Wrongful Death Act on November 22, 2019 in the Sixth Judicial District Court; D-623-CV-2019-000105.

4. Adrian Placencia was an inmate in the custody and care of the Hidalgo County Detention Center (hereinafter "HCDC") from July 25, 2019 until his death on July 28, 2019. While incarcerated, Mr. Placencia was completely dependent upon HCDC for his care and well-being.

5. Defendant Ward was the warden of the Hidalgo County Detention Center at all material times.

6. Defendant Ward is sued in her individual and official capacities.

7. Defendant Hidalgo County Board of County Commissioners is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983. At all times material to this Complaint, the Board was the employer of Defendants Ward, Christina Talavera, Ty Hendrix, and Felix Jimenez.

8. Defendant Christina Talavera was a detention corporal at the Hidalgo County Detention Center at all material times.

9. Defendant Talavera is sued in her individual capacity only.

10. Defendant Ty Hendrix was a detention officer at the Hidalgo County Detention Center at all material times.

11. Defendant Hendrix is sued in his individual capacity only.

12. Defendant Felix Jimenez was a detention officer at the Hidalgo County Detention Center at all material times.

13. Defendant Jimenez is sued in his individual capacity only.

14. Defendant Christy Lewis at all material times was the Health Services Administrator of HCDC.

15. Defendant Lewis is sued in her individual capacity only.

16. Defendant Glenda McKenna at all material times was a medical provider at HCDC.

17. Defendant McKenna is sued in her individual capacity only.

18. Defendant Vital Core Health Strategies, LLC (hereinafter referred to as "Defendant Vital Core") is a Kansas corporation doing business in New Mexico.

19. Defendant Vital Core was at all material times the employer of Defendants Christy Lewis and Glenda McKenna.

20. Defendant Vital Core was contractually responsible for the provision of health care at HCDC during the events material to this complaint.

21. Defendants were acting under color of state law and within the scope of their employment at all material times.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

22. Adrian Placencia was booked into HCDC on July 25, 2019.

23. Immediately before he was booked, Adrian had a probation revocation hearing.

24. During this hearing, Adrian described his serious mental health issues to the court.

25. He explained that he had been experiencing panic attacks and extreme anxiety over the past eight (8) months and had a long history of anxiety.

26. He further explained that he did not believe it would be beneficial to his mental health if he was remanded into custody.

27. In fact, Adrian warned the court his mental health would deteriorate if he was sent to jail.

28. Adrian had a history of seeking out mental health care for frequent bouts of psychosis, auditory hallucinations, suicidal ideations, delusions, paranoia and other severe symptoms.

29. Adrian knew that being trapped, hearing loud noises, yelling, and stress further escalated his behavior and triggered suicidal thoughts when he felt irritable or anxious.

30. He also knew that calling his family or going outside were positive distractions for his suicidal ideations.

31. Adrian asked the court to allow him to enter a treatment facility where he could be treated for his stress and anxiety instead of remanded to jail custody.

32. Instead, Adrian was remanded to custody pending a 60-day diagnostic evaluation.

33. When Adrian arrived at HCDC, Defendant McKenna conducted a medical intake.

34. Defendants Talavera and Lewis knew Adrian had a history of serious mental health issues.

35. Defendants also knew Adrian was normally kind, cooperative and pleasant.

36. Adrian had been booked into the jail a few months earlier and had positive indicators for suicidality.

37. Despite knowledge of Adrian's mental health history, Defendant McKenna failed to document Adrian's serious, ongoing mental health issues.

38. Defendant McKenna failed to refer Adrian for any mental health evaluation or treatment.

39. Adrian indicated he had used drugs two weeks prior to being booked, so Defendant McKenna recommended he be placed on withdrawal protocol, including medication to treat any symptoms of withdrawal.

40. As a result, Adrian was placed on 30-minute medical watches to monitor him for signs and symptoms of withdrawal.

41. Despite this protocol, staff, including Defendants Hendrix, Jimenez and Talavera, failed to conduct proper checks, frequently allowing Adrian's welfare to go unmonitored for long periods of time.

42. These checks were ordered to ensure Adrian remained safe and healthy during his time at HCDC.

43. Defendants knew it was important to conduct regular checks as ordered but failed to do so.

44. Defendants knew that suicide is the most prevalent form of death in detention facilities.

45. Defendants also knew suicide by hanging is the most common form of suicide in detention facilities.

46. Defendants had been trained that proper supervision of inmates will often prevent suicide.

47. Defendants were also trained to report certain behaviors to mental health staff that suggest an inmate is at risk for suicide.

48. These behaviors include lack of interest in surroundings, significant loss of appetite, and withdrawal.

49. Adrian was housed in a holding cell for the first several days of his detention at HCDC.

50. Holding cells are not designed for permanent housing and are typically barren of furniture, including bunks.

51. While in holding, Adrian was housed alone and physically isolated from other inmates.

52. Although he was housed alone, an inmate in an adjacent cell was able to speak with him through the vents.

53. This inmate could hear Adrian crying, "I can't do it, I can't make it."

54. Even in the early hours of his detention, it was obvious Adrian's mental health was quickly deteriorating.

55. The first evening Adrian was in HCDC, he refused to eat his dinner when offered.

56. Adrian then refused his breakfast the following morning.

57. Despite two meal refusals in a row, staff made no attempt to check on his well-being and mental health status.

58. HCDC staff made no mental health referrals, even as Adrian refused food and cried out for help.

59. The inmate in the cell next to Adrian watched uneaten trays be removed from Adrian's cell.

60. Because Adrian was not eating, this inmate knew something was wrong.

61. As he watched Adrian quickly deteriorate, the inmate next door told the guards they needed to focus on Adrian because he was not going to make it.

62. In fact, this inmate was so concerned for Adrian's wellbeing, he asked guards if they could be housed together in general population so he could take care of Adrian.

63. Adrian was not moved to general population with this inmate and continued to be housed alone for the rest of his time at HCDC.

64. Defendants Hendrix, Talavera, Jimenez and other HCDC staff continued to watch Adrian's condition worsen over the next days.

65. Staff noted Adrian was consistently sleeping or lying down for many hours of the day and frequently refusing food.

66. Despite Defendants' knowledge of Adrian's mental health and their training on common symptoms of suicidal ideation, Defendants did not seek out any mental health care for Adrian or closely monitor his rapidly declining condition.

67. Adrian spent 2 days in the small holding cell without any recreation.

68. After spending 2 days in a holding cell, Adrian was moved to an incredibly small, windowless, maximum security segregation cell.

69. The following morning, on July 28, 2019, Defendant Hendrix noticed Adrian was "mad from the get-go."

70. Defendant Lewis also noticed that Adrian was unusually agitated and anxious throughout that day.

71. Adrian refused breakfast when it was offered to him.

72. Defendant Hendrix later heard Adrian throwing a cup around his cell that morning.

73. Defendant Hendrix also saw Adrian covering his face with his sheet.

74. Adrian then refused to eat his lunch.

75. Around 2:00 p.m., Adrian asked Defendant Hendrix if he could call his father.

76. Defendant Hendrix refused to allow him a phone call and got into an argument with Adrian.

77. Adrian became extremely agitated, so Defendant Hendrix called Defendant Talavera.

78. Defendant Talavera told Adrian to calm down, to which Adrian responded, "go to hell."

79. Defendants knew Adrian was normally a kind person.

80. Adrian's agitated behavior was completely uncharacteristic based on the defendants' knowledge and experience with him.

81. Despite his unusually agitated behavior, Defendants Hendrix and Talavera made no attempt to ensure Adrian was well.

82. At 2:49 p.m., Defendant Hendrix noted Adrian had written "fuck you" on the glass of his isolation cell door in toothpaste.

83. Defendant Hendrix failed to make any additional check to ensure Adrian was well or safe.

84. Defendant Hendrix still failed to make any effort to seek mental health care for Adrian.

85. Defendant Hendrix then failed to conduct another check of Adrian within thirty (30) minutes.

86. At approximately 3:29 p.m., Defendant Hendrix returned to Adrian's cell to conduct a cell check.

87. When he looked into Adrian's cell, Defendant Hendrix saw Adrian hanging from his bunk by a sheet.

88. Defendant Hendrix called Defendant Lewis over to Adrian's cell.

89. Defendant Hendrix then opened the door to Adrian's cell and cut him down from the noose.

90. Adrian was unresponsive without a pulse when he was cut down.

91. Defendant Lewis told Defendant Hendrix to go retrieve the "jump bag," a bag containing emergency medical response equipment, and the automated external defibrillator (AED).

92. Defendant Hendrix went to the medical department and returned with only an AED, and without any other emergency medical equipment.

93. Defendant Talavera later arrived at Adrian's cell and was asked to go to the medical department and retrieve a stethoscope for Defendant Lewis.

94. Finally, 6 minutes after finding Adrian hanging in his cell, Defendants Hendrix and Lewis contacted emergency medical services.

95. Emergency medical services arrived at approximately 3:45 p.m., along with Hidalgo County Sheriff's officers.

96. Defendant Hendrix, Defendant Lewis, and emergency responders were unable to resuscitate Adrian.

97. After Adrian's death, Defendants Hendrix, Lewis, Talavera, and Jimenez were interviewed by Hidalgo County Sheriff's Officers.

98. Defendant Talavera told officers she was training both Defendant Hendrix and Jimenez at the time Adrian died.

99. Defendant Talavera told officers she had been conducting cell checks every 30 minutes throughout Adrian's detention, along with Defendant Hendrix.

100. Defendant Talavera lied to the officers investigating the death.

101. Defendant Talavera and Hendrix actually frequently failed to conduct those checks every 30 minutes as required, including the check immediately preceding Adrian's death.

102. Defendant Talavera admitted she knew Adrian.

103. Defendant Talavera told officers Adrian seemed worse off during this detention than one earlier that year.

104. Defendant Talavera admitted she knew Adrian was "way better before."

105. Defendant Jimenez was interviewed by officers as well.

106. During his interview, Defendant Jimenez told officers he worked the three previous days while Adrian was in the jail but had absolutely no contact with him the entire time.

107. In fact, Defendant Jimenez did have contact with Adrian and was responsible for conducting many cell checks.

108. Defendant Jimenez lied to the officers investigating Adrian's death.

### COUNT I: VIOLATION OF FOURTEENTH AMENDMENT: INHUMANE CONDITIONS OF CONFINEMENT/ INADEQUATE MEDICAL CARE
### (All Defendants)

109. Plaintiff restates each of the preceding allegations as if fully stated herein.

110. Plaintiff has a due process right under the Fourteenth Amendment to humane conditions of confinement and adequate medical care.

111. Rather than treat Plaintiff's mental health condition, Defendants chose to place him in solitary confinement.

112. For the first three days of his detention, Adrian was housed in a holding cell.

113. Holding cells are typically very small cells designed for short-term housing.

114. These cells are typically barren of furnishing, including bunks, toilets, or desks.

115. Adrian remained in this cell for approximately three days until he was moved to another solitary cell, Max-1.

116. Max-1 was a small, maximum-security segregation cell with only a small window on the door of the cell for guards to look into for observation.

117. In addition to the conditions of the cells themselves, Adrian was not provided any opportunity for recreation or exercise throughout his time at the jail.

118. Defendant Ward, as the warden of HCDC, had a duty to know who was being housed in segregation at the jail.

119. Defendant Ward had a duty to ensure inmates housed in solitary confinement were housed in humane conditions.

120. Defendants Ward, Talavera, Hendrix, and Jimenez failed to take reasonable measures to prevent the harm caused by Plaintiff's self-destructive actions, which were worsened by the isolation of solitary confinement and inadequate medical care.

121. Defendants Ward, Talavera, Hendrix, and Jimenez knew Plaintiff faced a substantial risk of serious mental or physical harm if his conditions of confinement did not meet contemporary standards of decency.

122. Defendants Ward, Talavera, Hendrix, and Jimenez had a duty to intervene and prevent this inhumane treatment rather than actively participate in it.

123. Defendants Ward, Talavera, Hendrix, and Jimenez were aware of the inhumane conditions in which Adrian was being housed.

124. Throughout his time in isolation, Adrian was on 30-minute medical watch.

125. Defendants knew these checks were important to ensure Adrian's health and safety.

126. Defendants knew the risk of Adrian harming or killing himself increased if they chose to forgo required welfare checks.

127. Despite this knowledge, Defendants failed to conduct these required checks.

128. Defendants knew Adrian's mental health would deteriorate and his risk of suicide would increase.

129. Adrian's mental health did deteriorate in these inhumane conditions.

130. In fact, Defendants had been warned by another inmate in the facility that Adrian would not survive in the conditions he was housed.

131. The risk to Adrian's mental health was so obvious even medically untrained inmates were able to identify it.

132. HCDC staff were trained to report concerns or symptoms of suicidality to medical staff at the jail.

133. Instead, staff ignored this inmate's reports of Adrian's suicidality.

134. Staff made no attempt to inform medical staff of the inmate's concerns of Adrian's declining mental health, including suicidality.

135. Although Defendants knew Adrian entered the jail with serious mental health issues and had a history of suicidality, Defendants failed to provide Adrian any mental health care during his time at the jail.

136. Defendants were aware the court had ordered a 60-day diagnostic.

137. 60-day diagnostics are frequently ordered for people who have mental health problems.

138. Defendants still failed to provide Adrian care as his mental status rapidly deteriorated.

139. Despite knowing his history of suicidality and his active mental health issues, described in court the same morning of his booking into HCDC, Defendants McKenna and Lewis failed to document these issues.

140. Shortly after entering solitary confinement, Adrian began exhibiting uncharacteristically agitated and angry behavior.

141. Defendants knew this behavior to be out of Adrian's usual kind and cooperative behavior.

142. Despite this drastic behavioral shift, Defendants still failed to provide Adrian with mental health care.

143. Additionally, Adrian slept an extraordinary amount of time during his isolation.

144. According to cell check logs, Adrian often slept for 12 to 13 hours at a time and for long periods throughout the day.

145. In fact, according to Defendants' documentation, Adrian slept approximately forty-six (46) hours of the approximately seventy-two (72) hours he was isolated at HCDC.

146. Defendants knew Adrian's declining mental health combined with his history of suicidality placed him at increased risk for suicide.

147. Defendants had been trained on the risks of suicide in jail settings, including symptoms associated with suicidality and the increased risk of suicide when an inmate is unmonitored.

148. These symptoms of suicidality include increased agitation and increased sleep.

149. Still, Defendants chose to forgo adequate monitoring despite these risks.

150. Defendants also knew Adrian's risk of suicide increased by being placed in solitary confinement.

151. During his time at HCDC, Adrian was not allowed out of his cell for any reason, including recreation, except to be moved between isolation cells.

152. All Defendants ignored these clear symptoms of suicidality and acted with deliberate indifference to this risk.

153. As a result of Defendants' indifference, Adrian was allowed to deteriorate until he committed suicide on July 28, 2019.

154. Because Defendants failed to conduct regular, 30-minute welfare checks of Adrian, he was able to complete suicide.

155. Plaintiff's conditions of confinement, as described above, amounted to punishment of a pre-trial detainee in violation of the Fourteenth Amendment to the United States Constitution.

156. As a proximate and foreseeable result of Defendants' deliberate indifference, Adrian Placencia suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and death.

### COUNT II: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS
**(Official Capacity Defendants)**

157. Plaintiff states each of the preceding allegations as if fully stated herein.

158. Defendant Board of County Commissioners has delegated the responsibilities of running HCDC to Defendant Ward.

159. Defendant Ward is the therefore the final policy maker responsible for the hiring training and supervision of HCDC employees.

160. Defendant Ward's policies therefore became the customs and policies of the County.

161. Upon information and belief, Defendant Ward has created a custom and policy of housing the mentally ill in inhumane conditions of confinement, specifically segregation or solitary confinement.

162. Upon information and belief, numerous inmates' mental health has deteriorated while in isolation in HCDC.

163. Prior to Adrian Placencia's detention at HCDC, a mentally ill man, Lupe Florez Alvarez, was booked into HCDC and was housed in inhumane and degrading conditions of confinement.

164. Alvarez was shackled to a cell door next to an open sewage hole which he was forced to eat near.

165. Alvarez was forced to sleep on a thin mattress on the floor while shackled to the bar.

166. Alvarez was shackled to this cell door for approximately two months, then moved to a cell referred to as the "hole."

167. As a result, Alvarez suffered physical injuries and emotional distress.

168. Similarly, another mentally ill man, Jerry Santoyo, was booked into HCDC and shackled by the ankle to a cell door near an open sewage hole after he began to experience severe anxiety.

169. Santoyo was shackled under the guise of "suicide watch" and remained in this condition for at least three months.

170. While shackled, Santoyo was forced to eat and sleep on a thin mattress on the ground near the open sewage hole.

171. Santoyo suffered anxiety, depression, panic attacks, and suicidal ideation, and eventually attempted suicide.

172. After his suicide attempt, Santoyo was moved to another segregation cell and remained isolated.

173. Filemon Varela, another mentally ill man, was also booked into HCDC and shackled to a cell door for several months, then intermittently through the remainder of his detention at the facility.

174. Jeffrey Hart was similarly shackled to a cell door at HCDC.

175. During his time shackled in this cell, Jeffrey was unable to sleep as the lights in the hallway were on 24 hours per day and officers stomped their feet while passing him to disturb and harass him.

176. Upon information and belief, the policies, customs, decisions, and practices of Defendant Ward have created a climate within HCDC whereby the mentally ill are deprived of adequate medical care and humane conditions of incarceration.

177. There is a causal connection between Defendants' policies and the violation of Plaintiff's constitutional rights, which amounts to deliberate indifference.

### COUNT III: NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Vital Core Health Strategies, LLC, Christy Lewis, and Glenda McKenna)

178. Plaintiff states each of the preceding allegations as if fully stated herein.

179. Defendant Vital Core was contracted by Hidalgo County to provide medical and mental health care to inmates housed at HCDC at all material times.

180. Defendant Christy Lewis was employed by Defendant Vital Core as the Health Services Administrator at HCDC.

181. Defendants Vital Core, Lewis, and McKenna had a duty to provide all inmates at HCDC, including Adrian Placencia, adequate medical and mental health care.

182. Defendants Lewis and McKenna knew that Adrian was in serious need of mental health treatment during his stay at HCDC.

183. It was clear to Defendants Vital Core, Lewis, and McKenna that Adrian was in need of mental health care.

184. Defendants were obligated to conduct meaningful and complete medical evaluations to capture and document any mental health or physical conditions suffered by Adrian when he entered the jail.

185. Defendants conducted insufficient medical evaluations and failed to document Adrian's clear mental health conditions, including anxiety and depression.

186. Defendants Lewis and McKenna had a duty to treat Adrian's conditions, including his anxiety and depression.

187. In addition to treatment, the standard of care required appropriate monitoring of potentially suicidal inmates.

188. Defendants Lewis and McKenna failed to ensure appropriate monitoring occurred to prevent Adrian's suicide.

189. Instead, Defendants Lewis and McKenna ignored Adrian's mental health symptoms and allowed him to deteriorate without treatment until he eventually completed suicide.

190. Defendants Lewis and McKenna's actions were more than negligent and reached the level of deliberate indifference.

191. Defendants Vital Core, Lewis, and McKenna failed to act reasonably under the circumstances and failed to provide the medical and mental health care Adrian desperately needed.

192. In doing so, Defendants Vital Core, Lewis, and McKenna breached their duties to Adrian.

193. As a result of Defendants Vital Core, Lewis, and McKenna's negligence, Adrian suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and death.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all counts so triable.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW P.C.

 /s/ Alyssa D. Quijano
Alyssa D. Quijano
Matthew E. Coyte
Attorneys for Plaintiff
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
aquijano@coytelaw.com
mcoyte@me.com